# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:21-CR-177 |
| v. | Hon. Claude M. Hilton |
| DEAN EDWARD CHEVES, | |
| Defendant. | |

### DEFENDANT DEAN CHEVES' MEMORANDUM IN AID OF SENTENCING

Defendant Dean Cheves, by and through undersigned counsel, respectfully submits his memorandum in aid of sentencing. Based on the circumstances described below, we ask the court to impose a sentence of time served, two years of home incarceration, and five years of supervised probation. This sentence would be sufficient, but not greater than necessary, to the purposes of sentencing prescribed in 18 U.S.C. § 3553(a).

**I. Introduction**

Mr. Cheves comes before the Court having pleaded guilty to two counts of engaging in illicit sexual conduct in a foreign place in violation of 18 U.S.C. §§ 2423(c) and (f)(3). Mr. Cheves accepts full responsibility for the conduct that led to his appearance before this Court for sentencing. This memorandum is not intended to excuse or minimize Mr. Cheves' conduct, but, rather, to present to the Court a full picture of Mr. Cheves.

The first and most critical thing to be said about Mr. Cheves relates to the issue of remorse. Mr. Cheves regrets his conduct and the decisions he made that led to this sentencing. He understands the gravity of this situation and appreciates and acknowledges the wrongfulness of his conduct and the harm he caused to others. Mr. Cheves' remorse and acceptance of

1

responsibility is not new. When he was first contacted by law enforcement on March 12, 2021, he fully complied with all requests that were presented. He followed the instructions of law enforcement and voluntarily left his family in the Philippines and returned to the United States. In a further act of acknowledging the wrongfulness of his conduct, Mr. Cheves pleaded guilty in October 2022 knowing he would be incarcerated following the plea hearing. Mr. Cheves has vowed to himself and his family that he will never again find himself in this situation.

## II. Standard

The Court is required to consider the Federal Sentencing Guidelines in imposing a sentence, but *United States v. Booker*, 543 U.S. 220 (2005) provides that the Guidelines are "merely one sentencing factor among many, and the calculated guidelines range must be considered in conjunction with the other § 3553(a) factors." *United States v. Reinhart*, 442 F.3d 857, 864 (5th Cir. 2006) (citing *Booker*, 543 U.S. 220). The Guidelines are "but one of eight factors the sentencing judge must consider." *United States v. Ovid*, No. 09-CR-216 (JG), 2010 U.S. Dist. LEXIS 105390, at *5 (E.D.N.Y. Oct. 1, 2010).

The factors enumerated in 28 U.S.C. § 3553(a) direct the Court to consider the full history and character of the defendant. Focus on §3553 factors "produce sentences that are moored to fairness, and to the goals of sentencing set forth in §3553(a)(2), but sometimes not so much to the advisory Guidelines range." *Ovid*, 2010 U.S. Dist. LEXIS 105390, at *5. 28 U.S.C. § 3553 requires a "sentence sufficient, but not greater than necessary" when the following factors are considered: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from

further crimes of the defendant . . . (3) the kinds of sentences available ; (4) the kinds of sentence and sentencing range established for (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; and (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In considering these factors, 18 U.S.C. §3661 states that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §3661 (2016).

The current sentencing guidelines applicable to child pornography related offenses under U.S.S.G. §§ 2G2.1 and 2G2.2 are regularly criticized, including by the Sentencing Commission itself, for failing to distinguish among defendants in any significant way. When the PROTECT ACT was enacted by Congress in 2003, the mandatory minimum term of imprisonment of 10 years was increased to 15 years for offenses related to the production of child pornography under 18 U.S.C. § 2251. Consequently, the Sentencing Commission increased the base level of § 2G2.1 from 27 to 32 to create a sentencing range that would meet the new mandatory minimum. In doing so, harsher penalties were enacted without using an empirical approach based on data about past sentencing guidelines. *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010); United States Sentencing Commission, *The History of the Child Pornography Guidelines,* Oct. 2009, *available at* https://www.ussc.gov/research/research-reports/2009-history-child-pornography-guidelines (last visited March 9, 2023).

As a result, there is almost no distinction in the sentences for first-time offenders such as Mr. Cheves, who had otherwise always been a law-abiding citizen, and the sentences for the most dangerous offenders. *Dorvee*, 616 F.3d at 184. The Sentencing Commission released a

report on these guidelines, in which it explained that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to most offenses and "the current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors." U.S. Sent'g Comm'n Report to the Congress: Federal Child Pornography Offenses (2012) ["Child Porn Report"] at ii, xi.  The report also noted that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104.   We respectfully submit that the Court should consider this issue in imposing Mr. Cheves' sentence.

### III. Mr. Cheves' Character and Personal History

Mr. Cheves is a 63-year-old father, husband, son, brother, and friend. He grew up the stepson of a California Highway Patrolman and lived in a strong family-oriented household with a great respect for law enforcement.  Mr. Cheves' mother passed away recently in October 2022 due to respiratory failure related to COVID-19. Tragically, his stepfather passed away shortly thereafter.  He was unable to say goodbye to his mother due to his incarceration and could not attend her funeral.  This is something that has haunted Mr. Cheves and will continue to do so for the rest of his life.  Mr. Cheves' maintains close relationships with his brother and sister, both of whom still reside in California.

When he was 17, Mr. Cheves left home.  His interests in the world outside of California drove him to spend most of his adult life living and working outside the United States.  As a result of his experiences abroad, Mr. Cheves is proficient in several languages.  He speaks Tagalog, Danish, Portuguese, Spanish, French, and Amharic.  After high school, he moved to Denmark for work.  In 1983, he returned to California for college where he earned a degree in Publishing Management from California Polytechnic State University.  He moved to Germany for work in 1985 and returned to the U.S. for work in 1986. From 1991 to 1992, he lived in California

4

working for 3M.

In 1992, Mr. Cheves married his first wife, Hanna Cheves (nee: Essayas), who had fled the Ethiopian Civil War. Shortly thereafter, Mr. Cheves was recruited to work for BDM International on a support contract with the Royal Saudi Air Force Base. He moved to Riyadh, Saudi Arabia for the position. After losing a friend in a bombing in 1995, worried for his family's safety, Mr. Cheves decided to move his family out of Saudi Arabia. They moved to Ethiopia for one year. In 1997, Mr. Cheves accepted a job with the United Stated Information Agency (which was reorganized under the U.S. Department of State in 1999). He moved to the Philippines for the position and stayed there until 2000. In 2000, Mr. Cheves and his family moved back to Virginia. Mr. Cheves and his then wife Ms. Essayas had two children together and divorced in 2001. Their daughter was born in 1995 and their son was born in 1998. Mr. Cheves has a close relationship with his son and daughter from his first marriage, both of whom are adults now. His daughter works in the legal field in Washington, DC and his son recently left the United States military to pursue a maritime position.

In 2008, Mr. Cheves married his current wife, Romela Bensurto, who is a naturalized American born in the Philippines. When Mr. Cheves married his current wife, she was a manager of a large international hotel resort in South Carolina. She selflessly gave up her career to support Mr. Cheves' job that required frequent travel and moving every few years. In 2011, Mr. Cheves was posted at the U.S. Embassy in Brasilia, Brazil, moving to Brazil from Virginia. They returned to Virginia in 2015 and moved to the Philippines in 2017 when he was assigned to the U.S. Embassy in Manila.

Mr. Cheves and current wife have one daughter together, A.C., who is 10 years old. Mr. Cheves and A.C. have a very close relationship and he stays in touch with her as best he can while

5

incarcerated

incarcerated. Mr. Cheves' wife and A.C. live in the Philippines. Prior to his arrest, Mr. Cheves and his wife had been planning and looking forward to his retirement and planned to settle down in the Philippines. Mr. Cheves is the sole provider for his family and his wife and A.C. are financially supported by Mr. Cheves.

When COVID-19 hit in December 2019, the U.S. Embassy in Manila closed, and the American staff was evacuated back to the United States. Mr. Cheves and other senior managers volunteered to stay behind and try to continue vital work, although under many constraints. During that time, Mr. Cheves developed a tumor within his left sinus cavity. By December 2020, it had become so large he began to have trouble breathing, experienced severe headaches, blurred vision, and earaches. Despite the fact that hospitals were overwhelmed with COVID-19 patients, he could no longer put off the needed surgery. He underwent surgery to remove the tumor on December 14, 2020. While in hospital, he contracted a serious case of COVID-19. Due to the limited resources and lack of vaccines, Mr. Cheves isolated at home for several months thereafter. He did not leave his designated room for 30 days. During this time, Mr. Cheves experienced severe side effects from COVID-19, such as loss of motor skills, difficulty writing, and severe and lingering brain fog.[1] Mr. Cheves had become so sick that he told his wife he believed he was going to die. Looking back at those months now, Mr. Cheves says he does not recognize who he was at that time. There were changes in his mood and behavior. The first week he went back to work after being sick he had his first car accident ever. He lost his temper with a co-worker, something he had never done before. He went to the grocery store and

---

[1] Brain fog, a system of COVID reported by 20 to 30 percent of people within three months of being infected, is a "disabling and destructive" symptom of COVID that is a disorder of the brain's "executive function." The Atlantic, *One of Long COVID's Worst Symptoms Is Also Its Most Understood,* Sept. 12, 2022, Ed Yong, *available at* https://www.theatlantic.com/health/archive/2022/09/long-covid-brain-fog-symptom-executive-function/671393/ (last visited March 10, 2023).

bought items he forgot he already bought just days before. His behavior following his case of COVID-19, including the underlying offenses, were out of character for him and shock him to look back on.

After his arrest in July 2021, Mr. Cheves was released on a personal recognizance bond with pretrial supervision and complied with all court-ordered conditions of release. Mr. Cheves resided with two close friends while on pretrial release, and home visits conducted by Pretrial Services during his pretrial release revealed no concerns. Since his arrest, Mr. Cheves has been attending therapy, which he acknowledges he has benefitted greatly from, and is adamant that he will continue to commit to therapy.

Mr. Cheves should be judged based on his entire life, not only on his inexcusable actions that led him to appear before this Court. His true character is described by his family and friends in the letters submitted to the Court. His adult children, Paulina and Lukas, know their father as a "kind, nurturing, and supportive parent" whose "appreciation and embrace of new countries, cultures, and experiences ignited our imaginations as children and contributed to the curious and adventurous spirits we still have as adults." Ex. A, Letter from Paulina and Lukas Cheves. His 10-year-old daughter, A.C., calls her dad "a great role model" and relies on her fond memories of him to cheer her up. Ex. B, Letter from A.C. His friend, Bihildis Singh, describes him as "a responsible person because he puts his family first above everything" and his colleague Michael Sullivan attests that Dean "helped nurture his colleagues' careers and made a positive impact on the communities where he lived." Ex. C, Letter from Bihildis Singh; Ex. D, Letter from Michael Sullivan.

Given his role as a career foreign service officer with the Department of State, the government will likely ask the Court to hold Mr. Cheves to a higher standard. We respectfully

disagree with any such request. The Court should take note of the otherwise exemplary career achievements Mr. Cheves obtained with the Department of State. While serving at the U.S. Embassy in Brasilia, Mr. Cheves received praise from Bill Burns, the Deputy Secretary of State at the time, John Boehner, who was the Speaker of the House of Representatives at the time, and many others for his hard work and assistance during their visits. Ex. E. Throughout his career, Mr. Cheves was routinely nominated for awards based on, *inter alia,* his performance, customer service, innovation, and crisis management skills. Ex. F. Additionally, he regularly received high marks and positive feedback on his employee evaluation reports. Ex. G. Notably, "there is no doubt that his exceptional leadership skills prior to the pandemic helped to ensure the facility [U.S. Mission to Manila] would survive the pandemic with minimal loss." *Id.* Mr. Cheves, as Director of Global Publishing Solutions (GPS) in Manila, was considered "an integral member of the GPS Management Team who is valued for his years of technical printing and shipping knowledge, leadership skills, and commitment to supporting United States foreign policy." *Id.*

Mr. Cheves is not the same person who made the egregious decisions that led to his arrest. Since his arrest and subsequent guilty plea and confinement, Mr. Cheves has had time to reflect on his poor choices. He has spent the last 4 months incarcerated at the Alexandria Detention Center. This case represents his first and only contact with the criminal justice system. He acknowledges the wrongfulness of his actions and the harm his actions have caused. While he cannot change the past, Mr. Cheves hopes to atone for his actions.

## IV. Nature and Circumstances of the Offense

Mr. Cheves deeply regrets his actions that led him to commit the acts that bring him before this Court for sentencing. Mr. Cheves' underlying conduct occurred while he was suffering from a severe case of COVID-19 and had been quarantining in isolation. This does not

excuse his behavior or act as a mitigating factor. A review of his interactions with the two complainants appear to show a person unrecognizable to Mr. Cheves. Mr. Cheves appeared to engage in uncharacteristic behavior that quickly devolved into the unlawful acts that bring him before the Court. While not seeking to minimize his behavior, we respectfully submit that it is relevant that Mr. Cheves did not seek out contact with Minor 1 or Minor 2. He attempted to dissuade one of the complainants from engaging in commercial sex acts, but ultimately relented and broke the law.

In December 2020, Mr. Cheves met Minor 2 online. They exchanged messages on an internet-based messaging platform and Mr. Cheves sent her money for dental procedures. Minor 2 sent Mr. Cheves nude photos and videos of herself on several occasions. Mr. Cheves never met Minor 2 in person and never engaged in sexual activity with Minor 2. Mr. Cheves deleted all of the photos and videos of Minor 2 off of his phone and had no intention of keeping or distributing that data. The government was able to recover that data off of Mr. Cheves' phone via forensic analysis after they obtained it from a warrant.

In January 2021, Mr. Cheves met Minor 1 online through an app that required the female to initiate contact. They engaged in communications over an internet-based messaging platform and met in person twice. Mr. Cheves sent money, approximately $60.00, to Minor 1 for cat food when she had requested it. During their first encounter, Minor 1 engaged in an oral-genital sex act on him and he took a video of this encounter. During their second encounter, Mr. Cheves and Minor 1 engaged in sexual intercourse at a hotel. Mr. Cheves and Minor 1 both held the phone to take videos of the encounter, but Mr. Cheves later deleted those videos from his phone. While he sent the videos to Minor 1, he did not send the videos anywhere else. The government was able to recover that data from Mr. Cheves' phone via forensic analysis.

9

The crimes that underly Mr. Cheves' guilty plea are his first encounters with breaking the law, are non-violent, and unlikely to ever occur again. Notably, there is a lack of aggravating facts related to the nature and circumstances of Mr. Cheves' actions. Mr. Cheves presents a low risk of recidivism. At the request of counsel, Mr. Cheves has undergone a psychosexual risk assessment by Lisa Hunt, LPC, LMFT, CSOTP. Lisa Hunt is the Founder and Executive Director for The Center for Clinical and Forensics Services, Inc., which is an outpatient private practice that provides a variety of specialized assessment and treatment services, with a focus on the impact of sexual abuse, including victim, offender, and family issues. Ms. Hunt received her bachelor's degree from the University of Central Florida in 1989, her master's degree in counseling at Rollins College in 1994, and is currently working on her dissertation for her Ph.D. program in criminal justice at Nova Southeastern University. She is a licensed professional counselor and certified sex offender treatment provider.

Ms. Hunt prepared a psychosexual evaluation assessment of Mr. Cheves based on a clinical interview with Mr. Cheves, the Statement of Facts, the Presentence Investigation Report, and a neuropsychiatry evaluation by Dr. Chiadikaobi Onyike. This assessment is comprehensive in nature, detailing Mr. Cheves' background and risk assessment. Based on her expertise, Ms. Hunt concluded that Mr. Cheves "has few factors associated with increased risk for the sexual abuse/exploitation of children" and "there is no evidence that he demonstrates a pattern of disregard for the rights of others." Exhibit H, Report of Lisa Hunt[2]. Notably, "given that the victims of the referral offenses were pubescent, there is no indication that he suffers from the sexual disorder, Pedophilia, which involves an attraction to children who have not yet reached puberty." *Id*. Mr. Cheves was also scored on the Static-99R, which positions offenders in terms of their relative degree of risk for sexual recidivism. Mr. Cheves had a total score of negative two,

---

[2] Mr. Cheves will seek leave to file the report of Ms. Hunt under seal.

which places him in the Below Average range of risk, indicating that it is highly unlikely that Mr. Cheves would reoffend.

## V. Need to Avoid Unwarranted Disparities

A review of cases involving violations of 18 U.S.C. §§ 2423(c) and (f)(3) support our requested sentence of time served, two years of home confinement, and 5 years of supervised release. We respectfully submit that sentencing Mr. Cheves to the maximum amount of 30 years for each count, and to serve the sentences consecutively, is unwarranted and would create an unwarranted sentencing disparity.

We submit that Mr. Cheves' conduct stands in stark contrast with the conduct of others that have led to significant terms of incarceration. Part (a)(6) of 18 U.S.C. § 3553 provides that "The court, in determining the sentence to be imposed, shall consider [ . . . ] the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The primary purpose of § 3553(a)(6) "was to reduce unwarranted sentence disparities nationwide." *United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007). Sentencing Mr. Cheves to a sentence within the USSG guidelines would create an unwarranted disparity.

***United States v. Park*, 443 U.S. App. D.C. 401, 404, 938 F.3d 354, 357 (2019)**

Joseph Park was convicted of child abuse in Connecticut in 1987. After serving five years in prison, he traveled to Mexico, where the U.S. alleged that he sexually abused children. He was extradited back to the U.S. where he was re-imprisoned until 1998. In 2003, he traveled to Cuba and was incarcerated by the Cuban government for nearly 3 years for corruption of a minor. In 2009, South Korea revoked his visa and ordered him to leave the country after engaging in indecent behavior while working there as a schoolteacher. In 2013, he was teaching English in

11

Saudi Arabia when he was asked to leave because of his "pedophile" behavior. The crimes for which he was charged occurred in 2015, when he was working as an English teacher in Vietnam, and he molested a young boy. After Mr. Park was deported from Vietnam to Thailand, a friend of his discovered child pornography on his computer and turned it over to U.S. authorities.

Mr. Park was charged with engaging in illicit sexual conduct in foreign places conduct in violation of 18 U.S.C. §§ 2423(c) and (e). He pleaded guilty to one count and was sentenced to 108 months in prison, a lifetime of supervised release, and a special assessment of $100.00.

***United States v. Lindsay*, 931 F.3d 852, 856 (9th Cir. 2019)**

Michael Lindsay frequently traveled from the U.S. to the Philippines where he owned a house. In 2011, Minor 1 and her older friend began to visit Mr. Lindsay's home and he would often have sex with the older friend and pay Minor 1's mother in exchange. Mr. Lindsay later began to engage in sexual encounters with Minor 1 and would pay Minor 1's mother after each encounter.

Mr. Lindsay was charged with illicit sexual conduct and engaging in illicit sexual conduct in a foreign place under 18 U.S.C. §§ 2423(b) and (c). A jury found him guilty of both counts, in addition to one count of attempting tampering with a witness and one count of obstruction of justice. The Court sentenced him to 100 months on all four counts (five years for each violation under 18 U.S.C. §§ 2423(b) and (c)), to be served concurrently, 5 years of supervised release, and a special assessment of $400.00.

***Phillips v. United States*, 734 F.3d 573, 575 (6th Cir. 2013)**

In 2001, Gregory Phillips traveled from the U.S. to Thailand to begin employment as a teacher. He had just finished 26 months of probation following a 1998 conviction in North Carolina for taking indecent liberties with a child. In 2004, he lived at a residence in Bangkok,

Thailand with a minor boy. U.S. authorities sought assistance from the Royal Thai Police to obtain a search warrant for the residence on suspicion that Mr. Phillips was engaging in illicit sexual conduct with the minor. When he became aware that U.S. and Thai authorities were searching for him, Mr. Phillips fled to Mexico where he stayed with an acquaintance who was a convicted sex offender, John Schillaci, who was then listed on the FBI's Top Ten Most Wanted. Mr. Phillips returned to the U.S. after a month and was indicted.

Mr. Phillips pleaded guilty to a single count under 18 U.S.C. §2423(c) and was sentenced to 37 months imprisonment, lifetime supervised release, and a $100.00 special assessment.

***United States v. Reed*, No. 17-216 (DWF/KMM), 2022 U.S. Dist. LEXIS 3776, at *1 (D. Minn. Jan. 6, 2022)**

In 2007, James Reed traveled to the Philippines where he met a 14-year-old girl. They engaged in sexual intercourse approximately ten times and Mr. Reed paid her each time. In 2008 the girl gave birth to a child that was fathered by Mr. Reed.

Mr. Reed pleaded guilty to one count in violation of 18 U.S.C. 2423(c). He was sentenced to 72 months in prison, 15 years of supervised release, $100.00 special assessment, and $6,000.00 in restitution.

**VII. Conclusion**

Based on the foregoing, we respectfully submit that sentencing Mr. Cheves to the maximum amount of 30 years for each count is inappropriate and would create an unwarranted sentencing disparity and would fail to take account of his otherwise exemplary life. We respectfully submit that a sentence of time served, two years of home confinement, and 5 years of supervised release is appropriate and in accordance with the requirements set forth in 18 U.S.C. § 3553(a).

Respectfully Submitted,

*Marc Eisenstein*

Barry Coburn
Marc Eisenstein
Coburn & Greenbaum, PLLC
1710 Rhode Island Avenue, N.W.
Second Floor
Washington, DC 20036
Phone: (202) 643-9472
Fax: (866) 561-9712
barry@coburngreenbaum.com
marc@coburngreenbaum.com

*Counsel to Defendant Dean Cheves*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on March 10, 2023 a copy of the foregoing was filed with the Clerk of the Court and served on all counsel of record via ECF.

/s/ Marc Eisenstein
Marc Eisenstein